**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank Tuin-Wong CHIN, Jr., M.D.,**
**Defendant-Appellant.**

No. 85–4835.

United States Court of Appeals,
Fifth Circuit.

July 29, 1986.

Robert P. McLeod, McLeod, Swearingen, Verlander & Dollar, Monroe, La., for defendant-appellant.

Dosite H. Perkins, Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before GARWOOD and HILL, Circuit Judges, and WILL,* District Judge.

* District Judge of the Northern District of Illinois, sitting by designation.

**498**

GARWOOD, Circuit Judge:

Appellant Frank Tuin-Wong Chin, Jr., M.D. appeals his conviction in a jury trial for eleven counts of illegally dispensing controlled substances without a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1). His sole contention on appeal is that the evidence is insufficient to support his conviction. We affirm.

### Facts and Proceedings Below

In 1982, Dr. Chin practiced family medicine in Monroe, Louisiana. At some point early that year, the Louisiana State Police targeted him for investigation to explore the methods he used to dispense various controlled substances, primarily diet-type pills, anti-anxiety, and sleeping pills. The narcotics division of the state police, specifically the Diversion Investigation Unit (DIU), handled the investigation of Dr. Chin.

After the investigation started, several DIU undercover agents visited Dr. Chin individually or as a "husband and wife" pair on diverse occasions from February to December 1982. In all, five of the seven members of the DIU team called upon him. Each DIU agent's relationship with Dr. Chin was basically the same. First, the DIU undercover agent, posing as one seeking such substance for his own (or spouse's) use, would go to Dr. Chin's office, where the agent's blood pressure and weight would be measured by an attendant. The agent then talked to Dr. Chin. These conversations were often tape recorded by the agents, although whether the visit would be taped was within the agent's discretion.[1] The trooper would attempt to receive prescriptions without giving Dr. Chin a legitimate medical reason, although

medical reasons were discussed in some instances. After a relationship was established with Dr. Chin, the agent would return seeking refills for the prior prescription or a new prescription for other controlled substances. Another method used by the DIU was for a female and a male agent to team as husband and wife, and then seek drugs for themselves or for their supposed spouse.

At trial, the undercover agents testified to various methods they used to obtain drugs from Dr. Chin. One tactic was for the agents to ask for sleeping pills solely to help them counteract the effects of diet pills previously prescribed to them by Dr. Chin or another doctor. In the case of one agent, sleeping pills were sought to "come down" after "partying all night" while on diet pills. Often agents made clear to Dr. Chin that others were taking their medication. The agents would attempt to obtain diet pills not to lose weight but to stay alert. Although medical reasons for a drug were occasionally discussed, the agents made an effort never to be the first to mention a valid medical reason for the medication they sought. If Dr. Chin offered some sort of medical purpose, the agents would agree or disagree as they felt necessary under the circumstances. The agents also would attempt to procure controlled substances for a spouse not then present, or let Dr. Chin know that a spouse was taking or abusing part of the agent's current prescription.

At the conclusion of this investigation, Dr. Chin was indicted on sixteen counts of illegally dispensing Schedule IV controlled substances.[2] A jury trial followed. Dr.

---

1. The jury at trial listened to these tapes and received a transcript of them. The transcript, however, was not officially offered into evidence, but was used primarily as a supplement to the tapes. The district court instructed the jury that in any conflict between a tape and the transcript the tape controlled. No objection is raised concerning this procedure.

2. The trade names of the drugs involved were Ionamin and Tepanil Ten-Tabs, each a diet-type pill, Librium, an anti-anxiety medication, and Dalmane, a sleeping pill. Conviction was had

on each type of medication. Each of these is a substance found in Schedule IV. Drugs are ranked in schedules according to their potential for abuse. Schedule I substances are strictly illegal. Schedule II substances have a high abuse potential leading to severe psychological or physical dependence but are currently accepted in some medical applications and can safely be used when a patient is under medical supervision. Schedule III substances have less potential for abuse leading only to moderate or low physical dependence or high psychological

Chin's motion for acquittal at the close of the government's evidence was taken under advisement. The defense rested without presenting any evidence. The jury found Dr. Chin not guilty on four counts and guilty on the remaining twelve counts. After the verdict, the district court granted Dr. Chin's motion for acquittal on one of the twelve counts because Dr. Chin had not signed the prescription, but denied the motion on the other eleven counts. Dr. Chin's motion for a new trial was also denied. He was subsequently sentenced to concurrent three-year sentences on each of ten of the counts and was fined a total of $100,000—$10,000 on each of these ten counts. Imposition of sentence was suspended with a five-year probation term on the one remaining count, the probation to commence on completion of the sentences on the ten other counts. This appeal followed.

### Discussion

The sole issue on appeal is whether the jury had sufficient evidence before it to convict Dr. Chin of dispensing controlled substances without a legitimate medical purpose in violation of 21 U.S.C. § 841(a)(1).[3] In a challenge to the sufficiency of the evidence, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). This Court has stated that

"[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en

banc) (footnote omitted), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Further, evidence relating primarily to the counts on which Dr. Chin was acquitted is not by reason of such acquittal deprived of whatever support it might otherwise properly afford for the verdict of guilty on any other count or counts. Our review of the sufficiency of the evidence to sustain the verdict on the counts on which Dr. Chin was convicted is based on the whole record "independent of the jury's determination that evidence on another count was insufficient." *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 478, 85 L.Ed.2d 461 (1984). *See United States v. Lubrano*, 529 F.2d 633, 636 n. 1 (2d Cir. 1975). *See also United States v. Merida*, 765 F.2d 1205, 1220 (5th Cir.1985); *United States v. Price*, 750 F.2d 363 (5th Cir.1985).

To assess the sufficiency of the evidence, we must, of course, refer to the substantive elements of the offense charged, here dispensing Schedule IV controlled substances in contravention of 11 U.S.C. § 841(a)(1). To sustain a conviction as to any count under this statute, the evidence must allow a reasonable fact finder to determine beyond a reasonable doubt as to that count: " '(1) that [Dr. Chin] distributed or dispensed a controlled substance, (2) that he acted knowingly and intentionally, and (3) that he did so other than for a legitimate medical purpose and in the usual course of his professional practice.' " *United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir.1986), (quoting *United States v. Rosen*, 582 F.2d 1032, 1033 (5th Cir. 1978)). Only the sufficiency of the evidence on the third element is disputed by Dr. Chin on this appeal.

Dr. Chin claims that the evidence at trial showed that he had a legitimate medical

---

dependence, and are currently accepted for use in medical treatment. Schedule IV substances are currently accepted in medical application and have a comparatively low abuse risk with a potential for only limited physical or psychological dependence.

**3.** 21 U.S.C. § 841(a)(1) provides:

"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

"(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...."

purpose in dispensing the Schedule IV drugs for which he was convicted. Dr. Chin argues that the agents presented symptoms to him for which the drugs could appropriately be prescribed, and that often these agents were overweight, although not strikingly so. Evidence at trial established that the DIU agents did not always obtain a prescription. Moreover, the evidence also showed that Dr. Chin would frequently warn the agents about the proper use of the medication, such as not to take diet pills to stay awake or not to use sleeping pills with alcohol, and that he often warned the agents about permitting an absent spouse to take the present spouse's medication. Indeed, Dr. Chin once demanded that an absent spouse come to see him before he would prescribe medication. As Dr. Chin claims, documents introduced at trial further established that he kept records of the drug prescriptions and charged only a twenty-dollar fee per visit. The evidence also showed that Dr. Chin prescribed medication in relatively small amounts.

Dr. Chin claims that the above does not reflect the usual "fat" doctor case where a doctor sets up an obesity practice and prescribes an inordinate amount of diet pills in order to "treat" these overweight patients. *See Rosen,* 582 F.2d at 1032 (obesity practice sixty percent of total family practice; large amounts of controlled substances given to undercover agents). Here, Dr. Chin was convicted on only three counts involving diet pills—two Ionamin prescriptions and one packet of Tepanil Ten-Tabs, apparently a pharmaceutical sample, to one agent over a period of months. Nor, Dr. Chin argues, does the record as a whole indicate the high level of professional medical abuse by doctors reflected in previous section 841 convictions where physicians use their offices as, in essence, drug clinics. *See Norris,* 780 F.2d at 1208 (doctor properly convicted who got patients together in a group, gave lecture, asked patients what drugs they desired, and gave patients these drugs without either a physical examination or instructions as to the proper uses of the drugs); *United States v. Jackson,* 576

F.2d 46, 50 (5th Cir.1978) (doctor properly convicted who prescribed Methaqualone in large doses without proper warnings or proper physical examinations).

After reviewing the record in the light most favorable to the government, however, we find substantial evidence presented at trial for the jury to convict Dr. Chin. First, we note that only the most cursory physical examination was given to the undercover agents before Dr. Chin prescribed the controlled substances. Usually, the agents weight and blood pressure were measured by attendants, but there was no further physical examination by Dr. Chin. On occasion, an agent's reflexes would be tested or a urine sample would be taken. Dr. Chin's "examination" consisted only of brief conversation with the agents about the various drugs involved. We have held these abbreviated examinations to be probative on the question of whether a legitimate medical purpose exists. *See Rosen,* 582 F.2d at 1036 (only blood pressure and weight taken). Indeed, as in *Rosen,* here

> "[n]o medical history of the patient was taken. Specifically, the patient was not asked whether he was allergic to any type of drugs, whether he had a heart condition or any other ailments which might affect him, anything in particular about his general health or previous illnesses, or illnesses from which he might be suffering at the time of the visit, his employment, etc.... On a patient's subsequent visit no history was taken, no questions were asked as to whether there were any ill effects from taking the pills, and the only conversation between the patient and the doctor was a comment as to whether weight was gained or lost, and what type of drug would be prescribed." *Id.* at 1034 n. 7.

The government also introduced unrebutted expert testimony by a physician to the effect that when a physician prescribes these controlled substances, significantly more elaborate medical examinations and precautions are needed than those provided by Dr. Chin.

Testimony at trial further established that with respect to Dr. Chin's records on these agents, Dr. Chin sometimes would write a medical reason in the patient's log regardless of what actually transpired in the office. For example, on Dr. Chin's chart for the July 8 visit of Steven Accardo (Agent Monachello) all that is noted, other than weight and blood pressure and the Dalmane prescription given, is "trouble sleeping." However, Monachello testified that he never mentioned to Dr. Chin that he had trouble sleeping, that he told Dr. Chin he had been taking "speed" "off the street" and "needed something to, quote, mellow out, unquote," and that Dr. Chin "asked me if I was having trouble sleeping" "and I said no." As another example, on Dr. Chin's chart for the May 27 visit of Lavele Roberts (Agent Graves) all that is noted, other than blood pressure and weight and the Ionamin prescription given, is "needs to lose weight" and "diet." Agent Graves testified that she never told Dr. Chin that she sought or needed to lose weight, and that

"... Dr. Chin wrote out a prescription for Ionanin. It was issued in my name of Lavele Roberts. But in conversation with Dr. Chin, I let it be known that this was for my husband [Rick Roberts, Agent Baudier] and that I would also be taking them, too, though. That we did share.

"Q You indicated sharing between you and Agent Baudier?

"A Yeah. He asked exactly who the prescription was going to be for. Whether it was for my husband or for myself. And I informed Dr. Chin it was for both of us.

"Q Did you indicate any reason why you or Agent Baudier wanted that particular medication?

"A Dr. Chin acknowledged that he knew why we were. At the start of the office visit Dr. Chin stated that he was

well aware that my husband was using it to stay awake while driving. And since I did not work, I was a housewife, that I was using it to also stay awake to party.
"....
"Q At any time during this visit did you indicate a desire to lose weight?
"A No.
"Q At any time during this visit did you indicate that the purpose of this prescription was for either you or Agent Baudier to lose weight?
"A No.
"Q Was the sole reason for the medication stated to Dr. Chin, which you have already stated it was?
"A Yes, sir. It was. For Baudier to stay awake while driving, and I'm partying with it.
"....
"A Dr. Chin did write out a prescription for Ionamin in my name, and stated that he did not, well it wasn't a statement. It was almost an instruction for me not to return back to the office. That he could understand why my husband was taking the medication but he could not understand a housewife taking it just to party with."[4]

Although Agent Baudier, as Rick Roberts, had earlier received an Ionamin prescription from Dr. Chin, the May 27 prescription was in the name of Lavele Roberts. Dr. Chin maintained wholly separate files for Rick Roberts and Lavele Roberts. There is no entry in the Rick Roberts file in reference to the May 27 prescription, nor any indication in the Lavele Roberts file that the May 27 prescription was for Rick Roberts. Agent Baudier, who had posed as Rick Roberts, testified that he had procured Ionamin from Dr. Chin, stating he wanted it to stay awake while driving.

The evidence presented at trial further showed that the DIU agents sought and

---

**4.** Agent Graves told Dr. Chin that "regardless my intentions were always to continue to use them [Ionamin]. I enjoyed it." He told her not to come back, although her husband could. Nevertheless, she did return and on several oc-

casions thereafter received Dalmane prescriptions from Dr. Chin, which she asked him for to offset the effects of Ionamin, or similar drugs, she was getting elsewhere.

received prescriptions and samples from Dr. Chin for completely nonmedical purposes. A favorite tactic of the DIU agents was to ask for diet pills not to lose weight, but to stay awake or to help them drive. Although it is true that Dr. Chin voiced disapproval of such conduct, he was willing to ignore the agent's proffered motives and write out a prescription. In one instance when an agent gave Dr. Chin an illegitimate reason for using an uncontrolled substance, Dr. Chin put his hands over his ears and stated that he did not want to hear it. On another occasion, he said, "I won't talk to you about that ... you're not supposed to take it to keep awake ... that's wrong, that's a misuse of it." Trial testimony further reflected that when medical reasons, such as weight loss or the inability to sleep were discussed, it was usually Dr. Chin, not the undercover agents, who first mentioned the medical reasons. In one instance, an agent refused to agree with Dr. Chin's proffered medical reason for obtaining sleeping pills, but he received the pills anyway. There an agent received sleeping pills after telling Dr. Chin, in response to a query, that he had no trouble falling asleep. In another instance, Dr. Chin specifically mentioned that he could not give out diet pills to help an agent stay awake, but that he could help him lose weight. Thus the evidence indicated that Dr. Chin would "give" the agents a medical excuse to receive pills, even if those agents did not at first offer one.

It was further established on the trial record that Dr. Chin was preoccupied with the way the authorities would view individual transactions. On one occasion, Dr. Chin warned the DIU agent to be careful when he let his wife take certain controlled drugs because the authorities were checking prescriptions.[5] On another occasion, Dr. Chin asked whether an agent was getting diet pills from a doctor who was apparently being tried for illegally dispensing

drugs. Dr. Chin prescribed sleeping pills to this same person, but stated that it was too risky for him to prescribe the diet pills. Moreover, when Dr. Chin once refused to prescribe diet pills to an agent, the evidence showed this action occurred only after he said he had received an anonymous tip that the police would be watching that agent. Dr. Chin stated that it would not look good to the police if he gave an "attractive" woman diet pills. Dr. Chin stated that he knew this agent and her husband were taking the pills to stay awake, but did not offer this as the reason for refusing to write a prescription. Thus the evidence showed that Dr. Chin displayed an intense interest in how the law enforcement authorities viewed his activities and seemed less concerned with whether the transactions were medically proper.

Various other instances testified to by DIU agents at trial supported the jury's verdict that Dr. Chin did not have a proper medical purpose in dispensing the controlled substances. For instance, testimony indicated that Dr. Chin knew that on some occasions an agent's spouse was taking, and abusing, an agent's medication, but he still refilled the prescription. This testimony also showed that DIU agents often asked for specific drugs by name. Expert testimony was proffered by the government that this should have been a "red flag" to Dr. Chin that the potential for drug abuse existed. Once Dr. Chin even let the agent pick out of a reference book the size of a pill that he wanted. He also gave an agent a sample packet of diet pills to "tide him over" until he could refill an old prescription the following week. An earlier refill was not possible because the agent had told Dr. Chin that his wife was sharing the prescription and the drugs were being used faster than the rate on the bottle. On one occasion, a prescription being written for the "husband" for a diet-type pill was at once changed to another

---

5. DIU agent Doug DeLaurel testified on direct examination that "Doctor Chin advised me that it was all right if my wife was taking some of the Librium, but I should be careful that all of the prescriptions were in my name. And if someone were to check the records, it would show that I was receiving all of the drugs. He also indicated that the authorities had been checking the records."

brand name when the "wife," for whom diet medication was not then being prescribed, said she liked the latter better.

■ After reviewing evidence establishing lack of proper physical examinations, improper motives given by agents to Dr. Chin for receiving medication but receiving the pills anyway, and a host of instances indicating that Dr. Chin himself knew the drugs were being used for purposes he recognized as illegitimate, we must conclude that the jury's verdict was supported by substantial and adequate evidence.

Dr. Chin further claims that the government failed to produce sufficient evidence on the proper standard of medical care. This complaint is grounded in Dr. Chin's cross-examination of Dr. Fleming, the government's sole expert witness, respecting his testimony as to what constitutes a legitimate medical reason for dispensing certain types of medication. Dr. Fleming testified on direct that he believed diet pills should not be prescribed to patients unless they were at least one hundred pounds overweight. During cross-examination, Dr. Fleming appeared to retreat a bit from this statement and testified that other doctors might disagree with him. The second instance was Dr. Fleming's refusal to admit that sleeping pills could ever be used to offset the stimulating effects of diet pills, despite cross-examination reflecting contrary indications in certain recognized texts.[6] One authority cited was the American Medical Association's book on drug evaluations, a reference book available in most medical libraries, that listed one particular drug that used both a stimulant and a sedative in the same pill. Another authority cited during cross-examination was Goodman and Gillman's "The Pharmacological Basis of Therapeutics," also conceded to be authoritative, which stated that physicians often use "soporifics" to counter the adverse effects of stimulants.[7]

■ Regardless of any hypothetical inquiry into the possibility of some use of "compensating drugs," however, we find sufficient evidence in the record to establish that in the instant case the controlled substances were not prescribed for legitimate medical purposes. First, we note that expert testimony is not always required in order to show that a physician is acting for other than proper medical purposes. *Rosen,* 582 F.2d at 1037 n. 10 (citing *United States v. Larson,* 507 F.2d 385 (9th Cir.1974)). Further, "the jury is not bound by such expert testimony and *may, of course, consider all of the facts and circumstances surrounding the prescribing as related by lay witnesses."* *United States v. Bartee,* 479 F.2d 484, 488 (10th Cir.1973) (emphasis added) (cited with approval by this Court in *Rosen,* 582 F.2d at 1037 n. 10). As to the diet pills, there was evidence tending to establish, as previously indicated, that the real reason the patients wanted the pills was to stay awake or as a stimulant to aid them at work, not to lose weight. The testimony showed that Dr. Chin himself recognized that this was improper. Evidence further established that the sleeping pills were sometimes prescribed to offset the use of diet pills, but it

---

**6.** Fed.R.Evid. 803(18) provides, in relevant part, that the following is not excludable as hearsay: "To the extent called to the attention of an expert witness upon cross-examination ... statements contained in published treatises, periodicals ... established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence...."

**7.** Cross-examination of Dr. Fleming revealed the following:

"Q [by the defense attorney] You might read it out loud [Goodman and Gillman's publication].

"A [Dr. Fleming, reading this publication] The central stimulant and anorectic, which is the appetite suppressant, effects in most of these drugs have proven inseparable. This compromises their use in the latter part of the day. Given after four p.m. they interfere with sleep at night. Since much of the overeating takes place in the evening, their value is obviously limited. The anorectic agents are often given with the soporific [a sleep-inducing agent] to overcome this difficulty but without conspicuous success."

also indicated that Dr. Chin knew the agents were abusing these diet pills and he did nothing to stop this abuse. If anything, Dr. Chin's actions would prolong the agents' drug use because he attempted to offset the effects of the stimulants and make their use more palatable. On other occasions, it is evident that Dr. Chin purported to prescribe the pills for sleeping, but really knew they were not used or requested for that purpose. There was testimony that Dr. Chin recognized that "taking Ionamin and Dalmane was a bad combination," yet knowingly furthered this practice by his prescriptions.

 Dr. Fleming's testimony is consistent with *Bartee* and *Larson* that simply because a drug may be prescribed in some circumstances does not establish that in any particular case the prescription was proper or for a proper purpose. Additionally, during direct examination, Dr. Fleming testified in response to hypothetical questions based on the facts of each individual count, that Dr. Chin in each instance prescribed these controlled substances without a legitimate medical purpose.[8] Dr. Fleming also testified on redirect examination that not all "soporifics" were prescription drugs, and that even if certain sporific or sedative prescription drugs designed for that purpose might properly be used to counteract the effect of stimulant drugs, this did not mean that just any soporific or sedative drug could be. With respect to the two nonstimulant drugs prescribed by Dr. Chin here, Librium and Dalmane, Dr. Fleming specifically testified that they were not designed or intended to offset the effect of a stimulant drug. There was no contrary evidence whatever. Indeed, as noted, there was evidence that Dr. Chin recognized that Ionamin and Dalmane were "a bad combination," yet prescribed Dalmane to offset the effects of Ionamin's being taken to stay up and "party."

We conclude that there is sufficient evidence that the prescriptions in question were not given for a legitimate medical purpose.

### Conclusion

Having reviewed the record, we find sufficient evidence, with respect to each count on which conviction was had, that Dr. Chin dispensed a controlled substance for other than a legitimate medical purpose. We therefore affirm his conviction.

AFFIRMED.

---

8. We observe that Dr. Chin produced no expert or other witness to contradict Dr. Fleming's testimony that under the facts of this case there was no legitimate medical purpose to the prescribing of these drugs.