UNITED STATES of America,
Plaintiff-Appellee,

v.

Isadore I. ROSEN, Defendant-Appellant.

No. 78–5025.

United States Court of Appeals,
Fifth Circuit.

Oct. 30, 1978.

Jack Peebles, New Orleans, La., for defendant-appellant.

John P. Volz, U. S. Atty., Robert J. Boitmann, Ronald A. Fonseca, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and VANCE, Circuit Judges.

VANCE, Circuit Judge.

Dr. Isadore I. Rosen was charged, in a twenty-five count indictment, with dispensing and distributing controlled substances [1] in violation of 21 U.S.C. § 841(a)(1). Dr. Rosen waived a jury and was tried by the court, which found him guilty on all twenty-five counts. He was sentenced to imprisonment for a period of five years with a two year special parole term under each of eleven counts and to imprisonment for a period of three years and a one year special parole term under each of the remaining fourteen counts. The sentences under all counts were ordered to run concurrently. He appealed to this court contending that the evidence against him was not sufficient to support his conviction.

Dr. Rosen is a sixty-eight year old physician who had been practicing medicine in Amite, Louisiana, a rural community, since 1951. He says that he gave up a general surgery and obstetrics practice because of his age. He began an obesity practice approximately seven years ago and testified that it grew until it amounted to approximately sixty percent of his total practice.

On separate occasions between April 29, 1976 and March 17, 1977, Dr. Rosen was visited by six law enforcement agents posing as patients.[2] The agents all utilized undercover names. The controlled substances which were mentioned in the indictment were either distributed to the agents by Dr. Rosen or obtained by them through use of prescriptions provided by Dr. Rosen.

■ To convict Dr. Rosen, it was necessary for the government to prove (1) that he distributed or dispensed a controlled substance, (2) that he acted knowingly and intentionally, and (3) that he did so other than for a legitimate medical purpose and in the usual course of his professional practice. *See United States v. Bartee,* 479 F.2d 484 (10th Cir. 1973). Dr. Rosen admits the first two elements of the charged offenses. The only contested issue is whether the evidence was sufficient to support a verdict of guilty of dispensing and distributing controlled substances other than in the course of professional practice and for a legitimate medical purpose.

Dr. Rosen contends that all of the Drug Enforcement Administration (DEA) agents who came to his office and solicited diet drugs under the guise of being diet patients [3] presented symptoms for which the drugs prescribed or dispensed were appropriate.[4] He argues that there was a medi-

---

1. The indictment involved substances found in Schedules II, III and IV. Schedule II substances have a high abuse potential leading to severe psychological or physical dependence but are currently accepted in some medical applications and can safely be used when a patient is under medical supervision. Schedule III substances have less potential for abuse leading only to moderate or low physical dependence or high psychological dependence, and are currently accepted for use in medical treatment. Schedule IV substances are currently accepted in medical application and have a low abuse potential with a potential for only limited physical or psychological dependence.

2. Using agents in this manner in the investigation of medical doctors has been approved and in many situations appears to be the only means of obtaining necessary evidence of a doctor's illegal activities. In *United States v. Jobe,* 487 F.2d 268 (10th Cir. 1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974), the court stated,

It has often been said that in enforcing laws pertaining to vice, narcotics and similar violations, officers may employ appropriate artifice and deception to determine illicit activities. When a person is shown to be ready and willing to violate the law, the providing of an opportunity therefor by undercover agents or police officers is not entrapment. 487 F.2d at 270 (citations omitted).

3. Dr. Rosen contends, and the evidence reflects that all the agents were overweight.

4. Dr. Rosen had concluded that amphetamine and amphetamine-like drugs were a desirable component of treatment of obese patients.

In 1968, drug manufacturers produced 13 billion doses of amphetamines and barbiturates—enough for 24 doses of sleeping pills and 35 doses of "pep" pills for each man, woman and child in the United States. In a 1971 article on amphetamine abuse, J. Novells, an Ann Arbor physician, outlined the following accepted medical application for amphetamines: dieting, depression, hyperki-

cal reason in each case for their dispensation and that no substantial evidence was presented that the drugs were dispensed for any other reason.[5] The government, however, argues that the pattern of distribution clearly indicates that the dispensation was not done in good faith for legitimate medical treatment.

It is settled that this court does not weigh the evidence or determine the credibility of witnesses. It is equally settled that in reviewing the sufficiency of the evidence we must take the view most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The district court made findings of fact [6] as to the mode of operation at Dr. Rosen's office. The extract from these findings set out below conveys the overall flavor of Dr. Rosen's operation as reflected in the record.[7]

nesis in children and enuresis. But, he says, results in all cases are unpredictable and when used as a treatment for obesity, the addictive tendencies of the drug should also be considered.

Davis, *Drug Abuse Control: Prescribing Controlled Substance Drugs,* 6 Cum.L.Rev. 331, 358–59 n. 111 (1975) (citing Novells, *Changing Patterns of Amphetamine Abuse: The Role of the Physician,* 70 Mich.Med. 997 (1971)).

5. The efficacy of such drugs has been argued within the medical profession, but all of the drugs prescribed by Dr. Rosen have been recognized as drugs legitimately used in the course of medical treatment.

6. No specific request was made for the court to set out special findings of fact pursuant to Rule 23(c). The court, however, noted in its finding of fact that it was in the best interests of the parties and the administration of justice to make such findings so that all concerned would be fully advised of the basis for the court's decision.

7. Patients were not required to make an appointment in advance. A receptionist would come to the waiting room and ask who was present for the obesity program. Those present for such program were then required to sign a register (a small spiral note book), and those who were there for the first time were also required to give the receptionist an identification card with their picture on it, usually, their driver's license. On the patient's first visit his name was transcribed onto a 3X5 card. The patient was then weighed on a 40 year old scale, his or her blood pressure was taken (in most instances by one of the doctor's employees, none of whom were registered nurses) and the information was thereafter transcribed on the 3X5 card. The other information placed on the card was the patient's address, the date of the visit, age, and the prescription given. No medical history of the patient was taken. Specifically, the patient was not asked whether he was allergic to any type of drugs, whether he had a heart condition or any other ailments which might affect him, anything in particular about his general health or previous illnesses, or illnesses from which he might be suffering at the time of the visit, his employment, etc., nor were any tests such as a hyperthyroid test [2] given. After the card was completed, the defendant proceeded to give a short stereotyped innocuous "lecture" relative to weight control, consisting primarily of telling the patients that they should reduce their food intake, drink plenty of water, chew their food slowly, loss of weight was accomplished primarily by using more calories than one consumes, and that exercise was necessary. In most cases he handed the patient a little yellow book about weight control. Usually these weight control "lectures" were given to several people at a time. Unless the patient was present by himself, these instructions were directed to the group as a whole with no attempt to individualize same. The defendant would call the patient to his desk which was in the same room where the lecture had been given, then discuss with the patient what type of prescription or pills he was going to give him, and then proceed either to give him a prescription or the pills. He received his fee for same in cash, but no record was made on the card of the amount charged each particular patient.[3] The doctor gave no specific instructions to the patient regarding the taking of the pills, except that which appeared on the label of the package or vial containing the pills.[4] The patient was not given an appointment for, and/or ever instructed with regard to follow up treatment. Thus apparently the patient was free to return or not return as the patient saw fit after receiving the pills. When a patient returned he was weighed (but his blood pressure was not taken). The only entry made on his 3X5 card on a subsequent visit was the date, the patient's weight and the prescription given. On a patient's subsequent visit no history was taken, no questions were asked as to whether there were any ill effects from taking the pills, and the only conversation between the patient and the doctor was a comment as to whether weight was gained or lost, and what type of drug would be prescribed. Sometimes pills or another prescription would be given when the patient had gained weight, and other times pills or prescriptions would be given when the patient lost weight.

[2] This is a simple test consisting of pinching the skin to determine by the wrinkles if the patient is subject to dehydration.

Dr. Rosen argues that the court below relied upon what it considered an inadequate quality of medical practice[8] to find criminal intent. He contends that the evidence relating to his general procedures is not sufficient to establish criminal intent.

■ The overweight government agents seen by Dr. Rosen received controlled substances medically indicated and approved for weight therapy or for resulting side effects. This superficial appearance of legitimacy tends to complicate the resolution of the ultimate issue. We must determine whether the evidence was sufficient to support a finding that the drugs prescribed or dispensed to these six agents were not prescribed or dispensed in good faith for a legitimate medical purpose and in the course of the doctor's professional practice.

A frequently quoted statement of the standard to be used in making this determination[9] was announced by this court in the case of *United States v. Collier*, 478 F.2d 268, 271–72 (5th Cir. 1973):

It is apparent that a licensed practitioner is not immune from the act solely due to his status, *White v. United States*, 399 F.2d 813 (8th Cir. 1968), but rather, because he is expected to prescribe or dispense drugs within the bounds of his professional practice of medicine. A physician is restricted to dispensing or prescribing drugs in the bona fide treatment of a patient's disease, including a dispensing of a moderate amount of drugs to a known addict in a good-faith attempt to treat the addiction or to relieve conditions or suffering incident to addiction. [Citations omitted.] However, under the guise of treatment a physician cannot sell drugs to a dealer nor distribute drugs intended to cater to cravings of an addict. [Citations omitted.] Congress did not intend for doctors to become drug "pushers." [Citations omitted.]

In making a medical judgment concerning the right treatment for an individual patient, physicians require a certain latitude of available options. *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973). Hence, "[w]hat constitutes *bona fide* medical practice must be determined upon consideration of evidence and attending circumstances." *Linder v. United States, supra*, 268 U.S. [5] at 18, 45 S.Ct. [446] at 449, [69 L.Ed. 819 (1925)].

Our facile quotation of general principle does not diminish the difficulty in its application. A majority of cases have dealt with facts which were so blatant that a statement of clearcut criteria in a form useful in other cases would have been superfluous to the decision. We are, however, able to glean from reported cases certain recurring

---

[3] The doctor claimed that he kept his records for income tax purposes as follows: He put $30 in his pocket each morning and then during the day paid in cash certain expenses such as cokes, salaries, etc. He pocketed all fees received during the day. At the end of the day he would count the cash in his pocket, subtract $30 and enter such amount as his cash receipts for that day.

[4] In some instances the package containing the pills distributed in the office set forth no instructions.

8. During oral argument, his counsel conceded that Dr. Rosen did not always maintain a quality practice and we agree. This is not, however, the basis of our affirmance.

9. The appellant argues that resolution of the issue turns on whether there exists a logical, rational and reasonable medical basis for the conduct of the physician vis-a-vis the symptoms complained of, perceived, and treated in the patient. He contends that unless the government proves beyond a reasonable doubt that there is no such relationship, the physician's conduct must necessarily be protected. Although this is not the correct standard, parts of Dr. Rosen's testimony show that his conduct probably did not satisfy even this standard.

Q. Okay. And, what did you think of his coming back within fourteen days?
A. I thought he was a screwball.
Q. What do you mean by screwball?
A. He probably wanted more of them. Maybe he was taking three or four a day or giving them away, and I wouldn't give it to him.
Q. By your saying you thought he was a screwball, you thought he was abusing the Biphetamine?
A. Exactly.
Q. But you told him to come back in fourteen more days?
A. That's right.

concomitance of condemned behavior, examples of which include the following:

(1) An inordinately large quantity of controlled substances was prescribed. *United States v. Behrman*, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922); *United States v. Warren*, 453 F.2d 738 (2nd Cir.), *cert. denied*, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972); *United States v. Brandenburg*, 155 F.2d 110 (3rd Cir. 1946).

(2) Large numbers of prescriptions were issued. *United States v. Abdallah*, 149 F.2d 219 (2nd Cir.), *cert. denied*, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945).

(3) No physical examination was given. *United States v. Warren, supra; White v. United States*, 399 F.2d 813 (8th Cir. 1968); *Brown v. United States*, 250 F.2d 745 (5th Cir.), *cert. denied*, 356 U.S. 938, 78 S.Ct. 779, 2 L.Ed.2d 812 (1958); *United States v. Brandenburg, supra.*

(4) The physician warned the patient to fill prescriptions at different drug stores. *United States v. Abdallah, supra.*

(5) The physician issued prescriptions to a patient known to be delivering the drugs to others. *United States ·v. Warren, supra.*

(6) The physician prescribed controlled drugs at intervals inconsistent with legitimate medical treatment. *United States v. Brandenburg, supra.*

(7) The physician involved used street slang rather than medical terminology for the drugs prescribed. *United States v. Larson*, 507 F.2d 385 (9th Cir. 1974).

(8) There was no logical relationship between the drugs prescribed and treatment of the condition allegedly existing. *See United States v. Behrman, supra; Webb v. United States*, 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497 (1919); *United States v. Warren, supra; White v. United States, supra; United States v. Brandenburg, supra.*

(9) The physician wrote more than one prescription on occasions in order to spread them out. *United States v. Bartee*, 479 F.2d 484 (10th Cir. 1973); *United States v. Larson, supra.*

The evidence against Dr. Rosen demonstrates a fairly consistent pattern. Many of the factors which courts have considered critical appear throughout the transactions encompassed by these counts. Viewing the evidence in the manner required by *Glasser, supra,* we will highlight illustrative occurrences.

On March 10, 1977, Dr. Rosen prescribed for agent Claude Smith, 90 Phendimetrazines (Count XVIII), 58 Ionamin (Count XIX), and 60 Placidyl (Count XVI), an inordinately large quantity of controlled substances by any standard.

No physical examination was given to any patient/agent other than the taking of the individual's blood pressure and weight.

On June 28, 1976, agent Antoine informed Dr. Rosen that he had lost only one pound because he had given the pills to his girl friend. Dr. Rosen responded, "I don't care what you do with them, let the cops bust you. . . . I'm going to keep you on these." He then reached into his drawer and got two more bags of the Phendimetrazine.

Dr. Rosen on various occasions told the agents where to get their prescriptions filled. During his testimony, agent Boyce recalled that Dr. Rosen said, "Take these to independents [sic] to get them filled." Two days later, after giving agents Munster and Boyce an inordinately large quantity of drugs (60 yellow capsules and 60 capsules of Ionamins each) Dr. Rosen told them to tell the police if they were stopped that they had gotten a two months' supply because they were going out of town. On the same occasion, minutes later, the two agents returned to the office and each received a prescription for 60 Placidyls. Agent Boyce recalled that Dr. Rosen again told them to get the prescriptions filled at the "Village Pharmacy in Independence."

On a separate occasion agent Smith testified that Dr. Rosen told a female patient, "I will give you anything you want."

On several occasions Dr. Rosen used street slang rather than medical terminology for the drugs prescribed. The following

excerpts from the record illustrate this habit. In the first two excerpts, agent Antoine related part of a conversation between agent Antoine and Dr. Rosen:

"You kids know all about these 'uppers' and 'downers,' don't you?" And I agreed, and he kind of agreed, and he started writing me a prescription . . . .

. . . [A]fter he read my patient card he said, "You only lost one pound." And I said, "Yes." He said, "I'm not going to give you 'Black Mollies' this time . . . ."

I said, "Why not, Doc?" He said, "Because you are not serious about losing weight. And 'Black Mollies' are for people who want to lose weight."

In the following testimony agent Smith described part of a conversation between Dr. Rosen and another patient:

He told the second female patient, "I am going to put you on some "Blacks" because they are better than the fluid pills.

The government produced an expert witness,[10] Dr. John Adriani, a medical doctor who appears to be a pharmacologist, teacher and writer of national prominence. Circumstances surrounding the dispensing of controlled substances by Dr. Rosen were posed to Dr. Adriani in hypothetical questions. He unequivocally testified that in his opinion such dispensing of drugs was not in the course of professional practice and for legitimate medical reason.

In reviewing the sufficiency of the evidence we have focused particularly on Counts XX through XXV. The evidence with respect to those counts is clear, convincing and unquestionably sufficient to support Dr. Rosen's conviction. It involves agents Munster and Boyce.

Agent Peter Munster (undercover name Patrick Marshall) first saw Dr. Rosen on March 10, 1977. He was accompanied by

Ronald F. Bittola, an acquaintance of the doctor who had worked for him on occasions. Munster was ushered into the inner office and weighed with his coat on. His blood pressure was also taken. Dr. Rosen advised him that his blood pressure was too high to get pills. Bittola went into another room with defendant and told the doctor that Munster would not cause any trouble. Dr. Rosen returned to the inner office, retook Munster's blood pressure, noted that it had dropped 10 points and stated that he now could give him pills. Munster was given a minute and a half lecture on weight reducing. During this time Dr. Rosen was winking and smiling. At the conclusion of the so-called lecture, Dr. Rosen asked what Munster was taking. When he replied that he was taking nothing, the doctor said, "Good, I can give you Biphetamines. They are in short supply." He gave Munster a prescription for 31 Biphetamines and a package containing 90 Phendimetrazines. When he asked the doctor if these pills would keep him awake, he was given a prescription for 60 Placidyls (Counts XV, XVI and XVIII of the indictment).

The doctor knew he was under surveillance by the local sheriff and was concerned that his office might be "bugged" and his telephone tapped. Bittola advised the doctor that Munster was an expert in the field of "bugging," and arrangements were made for Munster to return with his equipment to check out the office. On March 15, 1977, he returned with agent David Boyce and proceeded to check out the office with a fake electronic "debugging" device. While Munster was engaged in "debugging," agent Boyce asked the doctor if he could get some pills. The defendant made some notations on a three-by-five card and wrote agent Boyce a prescription for 60 Biphetamines (Count XX of the indictment). Agent Boyce did not receive a lecture on losing weight, nor was his blood pressure taken. The doctor was advised that no

---

**10.** In *United States v. Larson,* 507 F.2d 385 (9th Cir. 1974) the court held that expert testimony is not required in order to show that a physician is acting outside the scope of prevailing

medical practice. The testimony of an expert is admissible as bearing on the "legitimate medical purpose" issue. *United States. v. Bartee,* 479 F.2d 484 (10th Cir. 1973).

"bugs" were found in the office, but that Munster and Boyce needed additional equipment to check out the phones for taps. Boyce asked for more pills like those given to Munster, and Dr. Rosen gave him a prescription for 60 Placidyls (Count XXI of the indictment). Munster then asked for more pills. The doctor told Munster that he would take care of him two days later when Munster returned with the equipment to check on the phone taps.

On March 17, 1977 the agents returned, proceeded with their spurious check for phone taps, and produced a fake tap which they had planted on Dr. Rosen's telephone equipment. Munster and Boyce asked for pills and each received from the doctor a package of 60 Ionamins (Counts XXII and XXIV of the indictment). He told them to say they had received a two months' supply because they were going to be out of town if they were stopped by police. They then went to their truck, returned to the office and asked for "those sleeping pills." The doctor gave them each a prescription for 60 Placidyls (Counts XXIII and XXV of the indictment). Neither agent was charged for his prescription and pills.

In connection with the dispensing of controlled substances to Munster and Boyce on March 15, and March 17, 1977, there was not even a pretense that the pills were given for legitimate medical purposes. They were dispensed to the agents in return for the services they had performed in searching for "bugs" and locating a suspected telephone tap.

■ The sentences on all counts are to run concurrently. Our review has resulted in our concluding that the evidence as to Counts XX [11] through XXV was clearly sufficient. We therefore pretermit a count by count analysis of the sufficiency of the evidence on the first nineteen counts. *See United States v. Ordoneaux,* 512 F.2d 63 (5th Cir. 1975).

The severity of the sentence was the subject of vigorous complaint by appellant's counsel during oral argument. He points out that the drugs dispensed by Dr. Rosen were not the Schedule I "hard drugs" which have the highest potential for abuse. Indeed, Dr. Rosen insists with apparent sincerity that the drugs he dispenses offer less potential for harm to the health of his "patients" than does the patients' excess weight. Counsel argues that five years imprisonment to this sixty-eight year old physician is more severe than is usually imposed on first offenders convicted of "pushing" heroin and selling other Schedule I substances.

■ We are bound by the principle that a district judge has wide discretion in determining what sentence to impose. The sentence is generally not reviewable if it falls within statutory limits. *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *United States v. White,* 524 F.2d 1249 (5th Cir. 1975), *cert. denied* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). We have held that a sentence will not be disturbed on appeal unless a clear abuse of discretion has been shown. *United States v. Moore,* 427 F.2d 38 (5th Cir.), *cert. denied* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970). No abuse of discretion has been shown. We feel, however, that Judge Coleman's remarks in *United States v. White, supra,* at 1254, bear repeating:

> Appellant has the opportunity under Rule 35 of the Rules of Criminal Procedure to move for reduction of sentence within 120 days after the receipt of our mandate. The attention of counsel is specifically directed to this fact.

AFFIRMED.

---

11. Count XX is one of the counts on which Dr. Rosen was sentenced to imprisonment for five years.