[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13501
Non-Argument Calendar

_____

D.C. Docket No. 2:16-cr-00031-RWS-JCF-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KECOLE DUKES,
a.k.a. Kecode Dukes,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 21, 2019)

Before TJOFLAT, JORDAN and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, defendant Kecole Dukes appeals his convictions for one count of conspiracy to possess with intent to distribute at least 28 grams of cocaine base, in violation of 21 U.S.C. §§ 841(b)(1)(B)(iii) and 846, and three counts of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a) and (b)(1)(C). Dukes argues that the evidence presented at trial was insufficient to convict him. After review, we affirm Dukes's convictions.[1]

## I.  BACKGROUND FACTS

According to the trial evidence, between August 20, 2015 and March 9, 2016, a task force with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") used two confidential informants ("CI"), Lecorey Goss and his girlfriend, Lacasarine Young, to conduct a series of controlled buys of cocaine base (i.e., crack cocaine) from defendant Dukes and his identical twin brother, Kemeca Dukes, either directly or through a middleman, Xavier Johnson. CIs Goss and Young both knew the Dukes brothers, and Goss had engaged in drug transactions with them before he began cooperating with law enforcement.

## A.    CI Young's Two Controlled Buys Using Middleman Johnson

The first controlled buy, which the task force used as a test run, occurred on August 20, 2015. CI Young met with Xavier Johnson at his house to buy some crack cocaine, ostensibly for one of her customers. Task force officers surveilled

_____

[1]Defendant Dukes does not challenge his sentence.

2

Johnson's house from a car and listened to Young's conversation with Johnson through Young's cellphone. When Young arrived, Johnson did not have any crack cocaine and told Young he would make some calls to find some. After Johnson's first call was unsuccessful, he told Young he was going to call "the Duke boys." One of the task force officers who was listening testified that he overheard Johnson say, "I'll call Kecole," and Young respond, "Oh, the Duke boys." The defendant here is Kecole Dukes.

After placing this call, Johnson told Young he was going to see the Dukes brothers at the Summit Street Apartments (where she knew the Dukes lived), and Young gave Johnson her money.[2] Johnson left Young waiting in his house and drove away. About fifteen minutes later, Johnson returned with .6 grams of crack cocaine, which he gave to Young. During a debriefing after the controlled buy, Young told a task force officer that Johnson got the crack cocaine from "the Duke boys," and specifically mentioned "Kiko," whom the officer knew to be the defendant Kecole Dukes.

On August 31, 2015, Young encountered defendant Kecole Dukes at a gas station. Young explained to defendant Dukes that her customer was not satisfied

---

[2]The apartment on Summit Street, also called the Lanier Terrace Apartments, was the home of the Dukes brothers' mother, Peggy Dukes. Defendant Dukes's sister testified that he lived with his sister and her children on Smallwood Road until sometime in 2016, when he moved in with his mother.

3

with the amount of crack he had received for the price and that she did not want to go through Johnson anymore because she was not getting her fair cut. Defendant Dukes responded that Young needed to go through Johnson and gave her Johnson's phone number.

The next day, September 1, Young conducted another controlled buy, this time wearing an audio recording device. A surveillance team followed as Young met Johnson at an automotive center, and then she and Johnson drove in separate cars toward Johnson's house. On the way, Johnson pulled over and told Young to wait at his house while he picked up the crack for her, and Young gave Johnson her money. Johnson then drove to the parking lot of the Summit Street Apartments, where two members of the surveillance team observed him by driving through the parking lot in separate unmarked cars. The first officer saw defendant Kecole Dukes standing in front of Johnson's front passenger door, and the second officer saw defendant Kecole Dukes first sitting in the passenger seat of Johnson's car and, on a second pass, walking away from Johnson's car. The officers knew the Dukes brothers from previous encounters and were able to identify defendant Kecole Dukes because he is physically heavier than his twin brother, especially in the face. Johnson then returned to his house, where he gave Young 2.6 grams of crack cocaine.

4

At a Labor Day party on September 5, 2015, Young saw defendant Kecole Dukes's brother Kemeca and complained again that she did not want to go through Johnson. Like his brother, Kemeca Dukes told Young that she had to go through Johnson to buy the crack.

**B.    CI Goss's Four Controlled Buys at the Dukes Brothers' Apartment**

In December 2015 and January 2016, CI Goss, while wearing an audio and video recording device, conducted several controlled buys directly from the Dukes brothers at the Summit Street Apartments. During the first transaction on December 10, 2015, Special Agent Spence Burnett drove Goss to the Dukes's apartment, where they saw defendant Kecole Dukes in the parking lot when they arrived. While Special Agent Burnett waited in the car, Goss entered the apartment building and purchased 3.14 grams of crack cocaine from Kemeca Dukes, defendant Kecole Dukes's brother. Meanwhile, defendant Kecole Dukes remained in the parking lot and looked around, and Special Agent Burnett believed defendant Kecole Dukes was acting as a lookout. When Goss left the apartment, he greeted defendant Dukes in the parking lot and told defendant Dukes that he would be selling drugs to earn money until he returned to prison on pending charges.

On December 16, 2015, Goss made a second controlled buy from Kemeca Dukes at the Summit Street Apartments. Young drove Goss to the apartments with

a surveillance team following.  When Goss first entered the apartment, neither of the Dukes brothers was home.  Another man named Wayne Tate was there and asked Goss if he was waiting for "Keko," meaning defendant Kecole Dukes.  Goss responded, "Yeah, Kemeca, Keko, either one."  At trial, Goss testified that he had engaged in drug transactions with both Dukes brothers in the past and that it did not matter to him which brother he dealt with during the December 16 transaction.  Because neither brother was there, Goss returned to Young's car and called Kemeca.  After Kemeca Dukes arrived in a white Dodge Charger registered in his name, Goss reentered the apartment and purchased 5.5 grams of crack cocaine from him.

During the third controlled buy on January 25, 2016, both Dukes brothers were present at the Summit Street apartment, as well as their mother and a family friend.  After Goss purchased a "slab" of crack cocaine from Kemeca Dukes, defendant Kecole Dukes entered the room and handed Kemeca an extra "love slab" to give to Goss as a reward for being a good customer.  Goss told the Dukes brothers that he had been breaking off small pieces from his customer's slab to sell for himself.  Goss asked the Dukes brothers if they could sell him a gun for protection, and Kemeca Dukes said he would try to find one.

On January 27, 2016, Kemeca Dukes called Goss and said that he had found a firearm, and Goss arranged to buy the firearm and more crack cocaine.  On

6

January 29, 2016, Young and Goss drove to the Summit Street apartment, again followed by a surveillance team. As they pulled into the parking lot, Kemeca Dukes also pulled up in his white Dodge Charger, and defendant Kecole Dukes drove out of the parking lot in a red Dodge Charger that was registered in his name. Goss went into the Dukes's apartment and purchased 7.45 grams of crack cocaine from Kemeca, but Kemeca did not have a firearm to sell to Goss.

## C.    CI Goss's Fifth Controlled Buy at a Gas Station

On March 9, 2016, Goss made a final controlled buy, this time at a gas station. Special Agent Burnett, posing as Goss's customer, drove Goss in an undercover vehicle to the prearranged gas station and parked in a parking space. Kemeca Dukes pulled up beside them in his white Dodge Charger, followed by a red Dodge Charger, which stopped between two gas pumps, facing the undercover vehicle. When Goss got out of Special Agent Burnett's car, he saw that defendant Kecole Dukes and another man named Swan were in the red Charger and that defendant Dukes was the driver. Goss got into Kemeca Dukes's white Charger and purchased 14.47 grams of crack cocaine from Kemeca. Special Agent Burnett believed that the red Charger was acting as a lookout during the transaction.

**D.    Defendant Dukes's Arrest and Search of Apartment**

On November 2, 2016, ATF agents arrested defendant Kecole Dukes at another apartment.  A search of the apartment revealed sandwich baggies, a digital scale, and a razor blade, all items commonly used in the distribution of narcotics.

**E.    Indictment and Trial**

A federal grand jury indicted defendant Kecole Dukes with conspiring with his brother Kemeca Dukes to possess with intent to distribute and to distribute at least 28 grams of cocaine base between August 1, 2015 and October 21, 2016 (Count One), and distributing cocaine base on September 1, 2015, January 25, 2016 and March 9, 2016 (Counts Two, Six, and Nine, respectively).  The indictment alleged that defendant Kecole Dukes carried out Counts Six and Nine by aiding and abetting his brother Kemeca Dukes.[3]

During a four-day trial the government presented testimony from ATF task force officers and CIs Young and Goss, as well as other evidence, including audio and video recordings, that established the facts recounted above.  In addition, the parties stipulated that: (1) the drugs purchased in the controlled buys contained cocaine base, which is a schedule II controlled substance, and that the cocaine base totaled at least 28 grams; and (2) defendant Kecole Dukes had prior state

---

[3]Kemeca Dukes was charged with multiple counts in the same indictment but pled guilty to one count of distributing cocaine base several days before trial.

8

convictions for, among others, possession of cocaine, sale of cocaine, and possession of cocaine with intent to distribute. In addition, a former narcotics investigator at the Hall County Sheriff's Office, Ricky Ansbro, testified that, in August 2009, defendant Kecole Dukes was arrested for, and later pled guilty to, sale of crack cocaine after he sold crack cocaine to Ansbro's confidential informant during a controlled purchase. After the government rested its case and at the close of all the evidence, defendant Kecole Dukes did not move for a judgment of acquittal.

In closing arguments, defense counsel argued, among other things, that surveillance team members may have confused defendant Kecole Dukes with his identical twin brother Kemeca Dukes, or otherwise been unable to properly observe defendant Kecole Dukes, and that the government's evidence showed that the CIs conducted the controlled buys with Kemeca Dukes. Defense counsel maintained that defendant Kecole Dukes just happened to be present or nearby during some of his brother's drug transactions, and "proximity is not participation."

During the jury charge, the district court instructed the jury on, among other things, the elements of each charged offense and what constitutes constructive possession and aiding and abetting. With regard to defendant Kecole Dukes's mere presence defense, the district court instructed the jury that "simply being

9

present at the scene of an event or merely associating with certain people and discussing common goals and interests does not establish proof of a conspiracy." The district court further stated:

> But finding that a defendant is criminally responsible for the acts of another person requires proof that the defendant intentionally associated with or participated in the crime, not just proof that the defendant was simply present at the scene of a crime or knew about it.
> In other words, you must find beyond a reasonable doubt that the defendant was a willful participant and not merely a knowing spectator.

The jury found defendant Kecole Dukes guilty on all counts. The district court sentenced defendant Kecole Dukes to a 96-month prison term.

## II.  DISCUSSION

### A.    Standard of Review

Ordinarily, this Court reviews de novo the sufficiency of the evidence to determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008). When a defendant raises a challenge to the sufficiency of the evidence on appeal that is different from the challenge he raised at trial, our review is for plain error. United States v. Baston, 818 F.3d 651, 664 (11th Cir. 2016). When, as here, the defendant failed to move for a judgment of acquittal and thus failed to raise any issue as to the sufficiency of the evidence, our review is only for a manifest miscarriage of justice. Id. at 663; United States v. Fries, 725 F.3d 1286, 1291 n.5 (11th Cir. 2013). Under this standard, we must affirm unless "the evidence on a

10

key element of the offense is so tenuous that a conviction would be shocking."

United States v. Milkintas, 470 F.3d 1339, 1343 (11th Cir. 2006) (quotation marks

omitted). "In making this determination, we must view the evidence in the light

most favorable to the government and accept all reasonable inferences and

credibility determinations that support the jury's verdict." Id. For the reasons that

follow, we conclude the government presented ample evidence of Dukes's guilt on

all counts, and thus we affirm his convictions, regardless of the applicable standard

of review.

**B.    Drug Offenses Under 21 U.S.C. §§ 841(a) and 846**

To convict a defendant under 21 U.S.C. § 841(a) of distribution of a

controlled substance, the government must prove that the defendant: (1) distributed

a controlled substance; and (2) he acted knowingly and intentionally. See United

States v. Rosen, 582 F.2d 1032, 1033 (5th Cir. 1978).[4] To "distribute" means "to

deliver (other than by administering or dispensing)" the controlled substance and

"deliver" means "actual, constructive, or attempted transfer" of the controlled

substance. 21 U.S.C. § 802(8), (11). As to intent, the government must prove that

the defendant knew the substance was a controlled substance. United States v.

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions by the former Fifth Circuit handed down prior to October 1, 1981.

11

Louis, 861 F.3d 1330, 1333 (11th Cir. 2017).[5]  "Intent to distribute can be proven

circumstantially from, among other things, the quantity of cocaine and the

existence of implements such as scales commonly used in connection with the

distribution of cocaine."  United States v. Poole, 878 F.2d 1389, 1392 (11th Cir.

1989).

A defendant "who has been indicted as a principal may be convicted on

evidence showing only that he aided and abetted the offense."  United States v.

Iglesias, 915 F.2d 1524, 1528 (11th Cir. 1990).  In order to find that a defendant

aided and abetted a substantive crime, the government must establish "that the

defendant in some way associated himself with the criminal venture, that he

wished to bring it about, and that he sought by his actions to make it succeed."

United States v. Broadwell, 870 F.2d 594, 608 (11th Cir. 1989).  A defendant may

be convicted under an aiding and abetting theory, even if he did not commit all of

the acts that constitute the elements of § 841(a), if the government proves beyond a

reasonable doubt that: (1) someone committed the substantive crime; (2) the

defendant contributed to and furthered that crime; and (3) the defendant intended

---

[5]Similarly, to convict a defendant under § 841(a) of possession with intent to distribute, the government must prove that "the defendant (1) knowingly (2) possessed [a controlled substance] (3) with intent to distribute it."  United States v. Faust, 456 F.3d 1342, 1345 (11th Cir. 2006) (quotation marks omitted).

12

to aid in the commission of that crime.  See United States v. Sosa, 777 F.3d 1279, 1292-93 (11th Cir. 2015).

To convict a defendant for conspiracy under § 846, "the evidence must show (1) that a conspiracy existed, (2) that the defendant knew of it, and (3) that the defendant, with knowledge, voluntarily joined it."  United States v. Perez-Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994).  "The essential element of a drug conspiracy charge is an agreement to violate federal narcotics law."  United States v. Carcaise, 763 F.2d 1328, 1332 (11th Cir. 1985).  The existence of such an agreement may be established through circumstantial evidence, including a defendant's conduct and circumstances suggesting a plan or scheme.  Id. at 1332 n.9.  Where there are multiple, separate drug transactions, a single conspiracy is established if a defendant's actions facilitated the criminal venture as a whole or the endeavors of other co-conspirators.  United States v. Brown, 587 F.3d 1082, 1089 (11th Cir. 2009).

## C.    Analysis

Here, as to the substantive drug offenses in Counts Two, Six, and Nine, the government presented substantial evidence that defendant Kecole Dukes participated in each controlled purchase of cocaine base either directly or by aiding and abetting his brother.  Specifically, as to Count Two, the government showed that: (1) on September 1, 2015, when CI Young gave Johnson money for crack

13

cocaine, Johnson told Young to wait for him at his house while he went to see the Dukes brothers at the Summit Street Apartments to get the drugs; (2) shortly thereafter, surveillance team members saw Johnson arrive in the parking lot of the Summit Street Apartments and observed defendant Kecole Dukes standing at, and then sitting inside, Johnson's car; and (3) Johnson then returned to his house, where he gave CI Young some crack cocaine.  Although defendant Kecole Dukes challenges the surveillance team members' identification of him, both officers testified that they knew what Kecole and Kemeca Dukes looked like from previous encounters with them and that they were able to tell them apart.[6]  Viewed in the light most favorable to the government, the forgoing evidence permitted a reasonable jury to find beyond a reasonable doubt that defendant Kecole Dukes conducted the September 1, 2015 drug deal with Johnson and, therefore, distributed cocaine base on that date.

As to Count Six, the government showed that: (1) on January 25, 2016, CI Goss, while wearing a wire over which Special Agent Burnett listened, purchased crack cocaine from Kemeca Dukes at the Summit Street Apartments; (2) Goss was in the apartment for five minutes, after which Special Agent Burnett drove him to a

---

[6]Defendant Kecole Dukes also misstates the record.  Task Force Officer Jamie Compton testified that he was driving approximately five miles per hour, not 20 to 25 miles per hour, through the parking lot when he saw defendant Kecole Dukes standing at Johnson's passenger-side door.  Also, neither Officer Compton nor Officer Christopher Ware, the other surveillance team member who identified defendant Kecole Dukes, testified that Johnson's car windows were tinted.

14

secure location and took the crack cocaine from him; (3) Goss explained that both Dukes brothers were present in the apartment when he arrived, but that he purchased the crack cocaine from Kemeca Dukes; (4) after the transaction was completed, defendant Kecole Dukes entered the room holding another slab of crack cocaine, which he handed to Kemeca, who then gave it to Goss; and (5) Goss and Special Agent Burnett both explained that in the drug trade, a "love slab" is an extra piece of crack cocaine given as a reward for being a good customer.  Viewed in the light most favorable to the government, a reasonable jury could find from this evidence that Kemeca Dukes distributed cocaine base to CI Goss on that date and that defendant Kecole Dukes contributed to and furthered his brother's distribution to CI Goss and intended to aid in the commission of the offense.

As to Count Nine, the government's evidence showed that: (1) on March 9, 2016, Special Agent Burnett drove CI Goss to a gas station; (2) Kemeca Dukes pulled up next to them in his white Dodge Charger and was followed by a red Dodge Charger, which parked nearby between the gas pumps; (3) as Goss stepped into Kemeca's vehicle, he saw that defendant Kecole Dukes was inside the red Dodge Charger; (4) once in Kemeca's vehicle, Goss purchased crack cocaine from him; (5) afterward, Goss returned to Special Agent Burnett's car and, as they left, Agent Burnett saw that the numbers on the license plate of the red Dodge Charger matched the numbers of the license plate registered to defendant Kecole Dukes;

15

and (6) Burnett thought the red Dodge Charger was there to serve as a lookout during the transaction.  From this evidence, the jury could reasonably find that Kemeca Dukes distributed cocaine base to CI Goss at the gas station, that defendant Kecole Dukes served as a lookout during the drug deal, thus contributing to and furthering his brother's distribution and showing his intent to aid in the commission of the crime.

Finally, as to the conspiracy charged in Count One, in addition to all the evidence already discussed, the government also showed that: (1) during the August 20, 2015 controlled buy, CI Young knew Johnson got the crack cocaine from "the Duke boys," and specifically mentioned "Kiko," a nickname for defendant Kecole Dukes; (2) when CI Young ran into defendant Kecole Dukes at a gas station on August 31, 2015, and asked if she could buy drugs directly from him, defendant Kecole Dukes responded that Young needed to go through Johnson and provided her with Johnson's phone number; (3) at a Labor Day party on September 5, 2015, defendant Dukes's brother Kemeca also told CI Young she needed to go through Johnson; (4) on December 10, 2015, Special Agent Burnett drove CI Goss to the Summit Street Apartments for a controlled buy with Kemeca, during which defendant Kecole Dukes stood outside the apartment building and appeared to act as a lookout; (5) during the December 16, 2015 controlled buy with Kemeca, CI Goss initially encountered a man named Wayne Tate, who asked Goss

16

if he was waiting for "Keko," and Goss told Tate he was waiting for either of the Dukes brothers; (6) Goss testified that in the past he had engaged in drug transactions with both Dukes brothers; (7) defendant Kecole Dukes had multiple prior state court convictions for possession of cocaine, sale of cocaine, and possession of cocaine with intent to distribute, including the sale of crack cocaine during a controlled drug purchase with another CI in 2009; and (8) a search of the apartment in which defendant Kecole Dukes was arrested revealed baggies, a digital scale, and a razor blade, all items commonly used for the distribution of crack cocaine.

From this evidence, the jury could reasonably find beyond a reasonable doubt that defendant Kecole Dukes had an illegal agreement with his brother Kemeca to possess cocaine base with intent to distribute it and to distribute cocaine base, that defendant Kecole Dukes knew of and voluntarily joined the agreement, and that defendant Kecole Dukes's actions in conducting some drug sales himself and in assisting his brother with other drug sales by acting as a lookout or bringing him additional drugs facilitated the criminal venture as a whole and the endeavors of his brother.

Defendant Kecole Dukes's argument that the government's evidence established only his mere presence or proximity to his brother's drug transactions is belied by the record. The government presented evidence that defendant Kecole

17

Dukes not only took actions that helped his brother conduct drug transactions, but in one instance he conducted the drug transaction himself.  The jury was given a "mere presence" instruction and clearly rejected defendant Kecole Dukes's contention that he was just a knowing spectator who happened to be present at, but did not participate in, his brother's drug deals.

In sum, defendant Kecole Dukes has failed to establish, even under <u>de novo</u> review, that the government's evidence was insufficient to support his convictions, much less that it was so tenuous that his convictions would be considered shocking under a manifest-miscarriage-of-justice review.  For these reasons, we affirm defendant Kecole Dukes's convictions on Counts One, Two, Six, and Nine.

**AFFIRMED.**