

## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

February 6, 2025

Mr. Mike Morath
Commissioner of Education
Texas Education Agency
1701 North Congress Avenue
Austin, Texas 78701-1494

**Opinion No. KP-0481**

Re: Interpretation of the University Interscholastic League's legal rights and duties regarding illegal steroid use under the Education Code (RQ-0578-KP)

Dear Commissioner Morath:

You requested an expedited opinion on the legal framework governing the prohibition on steroid use in University Interscholastic League ("UIL") athletic competitions.[1] In particular, you indicate that UIL "received several complaints regarding its competitions" and direct us to an attached letter—written by UIL Deputy Director Jamey Harrison—which itemizes "the specific questions that need to be resolved." Request Letter at 1. The letter confirms that UIL "received numerous inquiries from coaches and parents . . . expressing concerns about a female student-athlete who may be taking testosterone . . . for gender-transitioning purposes" and raises three questions involving: (1) the scope of the Education Code's medical exception, (2) UIL's authority to investigate a student-athlete's suspected use of steroids, and (3) the obligations that follow from eligibility questions. Attachment at 1–3. We address each in turn.

**Background on the UIL program and rules.**

We begin with a discussion of UIL's program and statutorily mandated rules. The UIL governs extracurricular athletic and academic contests across Texas. *See generally Univ. Interscholastic League v. Sw. Officials Ass'n, Inc.*, 319 S.W.3d 952, 954 (Tex. App.—Austin 2010, no pet.). In relevant part, the Education Code directs the UIL to adopt baseline rules "prohibiting a student from participating in an athletic competition sponsored or sanctioned by the league" unless the following conditions apply:

---

[1] Letter and Attachment from Mr. Mike Morath, Comm'r of Educ., Tex. Educ. Agency, to Hon. Ken Paxton, Tex. Att'y Gen. at 1 (Feb. 4, 2025), https://www.texasattorneygeneral.gov/sites/default/files/request-files/request/2025/RQ0578KP.pdf ("Request Letter" and "Attachment," respectively) (Attachment on file with the Op. Comm.). Because the event at issue is scheduled to begin on February 7, 2025, we proceed without external briefing.

(1) the student agrees not to use steroids and, if the student is enrolled in high school, the student submits to random testing for the presence of illegal steroids in the student's body, in accordance with the [steroid-testing] program established under Subsection (d); and

(2) the [UIL] obtains from the student's parent a statement signed by the parent and acknowledging that:

   (A) the parent's child, if enrolled in high school, may be subject to random steroid testing;

   (B) state law prohibits possessing, dispensing, delivering, or administering a steroid in a manner not allowed by state law;

   (C) state law provides that bodybuilding, muscle enhancement, or the increase of muscle bulk or strength through the use of a steroid by a person who is in good health is not a valid medical purpose;

   (D) only a licensed practitioner with prescriptive authority may prescribe a steroid for a person; and

   (E) a violation of state law concerning steroids is a criminal offense punishable by confinement in jail or imprisonment in the Texas Department of Criminal Justice.

TEX. EDUC. CODE § 33.091(b); *see also id.* § 33.091(a)(3) (defining "[s]teroid" by reference to section 481.104 of the Texas Controlled Substances Act, which includes "testosterone" as well as "any substance that is chemically or pharmacologically related to testosterone"); *see generally Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.*, 901 S.W.2d 401, 407 (Tex. 1995) ("As a general rule, the legislature impliedly intends that an agency should have whatever power is reasonably necessary to fulfill a function or perform a duty that the legislature has expressly placed in the agency." (citation omitted)).

The Education Code likewise directs that "[e]ach student participating in an extracurricular athletic activity must complete the [UIL] forms entitled 'Preparticipation Physical Evaluation--Medical History' and 'Acknowledgment of Rules.'" TEX. EDUC. CODE § 33.203(a). Notably, those forms "must clearly state that [a] failure to accurately and truthfully answer all questions . . . [is] a condition for participation in an extracurricular athletic activity" and "subjects [the] signer . . . to penalties determined by the [UIL]." *Id.* § 33.203(b). A student-athlete and their parent or guardian must also sign a form discussing illegal steroid usage and testing,[2] which requires all to affirm that the student-athlete "will not use anabolic steroids as defined in the UIL Anabolic Steroid Testing

---

[2] CONSTITUTION AND CONTEST RULES, UIL, § 1205(a)(4), https://www.uiltexas.org/files/policy/ 2024-2025-UIL-Constitution.pdf ("CONSTITUTION AND RULES").

Program Protocol."[3] Further, a parent must acknowledge that "bodybuilding, muscle enhancement, or the increase of muscle bulk or strength through the use of a steroid by a person who is in good health is not a valid medical purpose." *Id.* § 33.091(b)(2)(C).

**A "valid medical purpose" under section 33.091 does not contemplate administration of a steroid to female minors for purposes of transitioning the minor's biological sex**.

Your first question asks "whether a minor's use of steroids for gender-transitioning purposes can ever be a valid medical purpose" under subsection 33.091(h). Attachment at 1. We note, however, that this subsection does not predicate the limited exception for steroid usage— providing a student need not agree "not to use steroids" or "submit to random testing" under the UIL's rules—on the existence of a "valid medical purpose" alone. A steroid must be "dispensed, prescribed, delivered, and administered by a medical practitioner for a valid medical purpose *and* in the course of professional practice." TEX. EDUC. CODE § 33.091(h) (emphasis added). Because the Education Code does not define these terms, we must assess the "common, ordinary meaning" of each phrase as reflected in relevant dictionaries and "usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 34–35 (Tex. 2017); *see also, e.g.*, TEX. GOV'T CODE § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").

We begin with the term "valid," which has long been understood as a descriptive reference to "legal strength or force" or something that has been "executed with proper formalities," meaning it is "incapable of being rightfully overthrown or set aside." BLACK'S LAW DICTIONARY 618, 1075 (6th ed. abridged 1991); *see also, e.g.*, WEBSTER'S NEW RIVERSIDE UNIVERSITY DICTIONARY 1274 (3d ed. 1994) (defining "valid" as "[w]ell-grounded" and "sound"). The term "professional," too, plainly sounds in the expected "characteristic of a profession." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 930 (10th ed. 1993); *see also, e.g.*, BLACK'S LAW DICTIONARY 1246 (8th ed. 2004) (referencing "professional" as "[a] person who belongs to a learned profession or whose occupation requires a high level of training and proficiency"); AMERICAN HERITAGE DICTIONARY 1400 (4th ed. 2000) (defining the term as "[h]aving or showing great skill," as with an "expert" or "[a] skilled practitioner"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 1811 (1981) (defining "professional" as "one that engages in a particular pursuit, study, or science for gain or livelihood . . . with sufficient authority or practical experience in an area of knowledge or endeavor to resemble a professional").

This conception of the valid, professional provision of medication is further reinforced in other frameworks that use nearly identical terminology. Chapter 481 of the Controlled Substances Act—the very framework from which UIL's definition of "steroid" is drawn, TEX. EDUC. CODE § 33.091(a)(3) (incorporating TEX. HEALTH & SAFETY CODE § 481.104)—also commands that medical "practitioner[s] . . . may not prescribe, dispense, deliver, or administer . . . or cause a controlled substance to be administered . . . except for a valid medical purpose and in the course of medical practice." TEX. HEALTH & SAFETY CODE § 481.071(a); *see also, e.g.*, *id.*

---

[3] PARENT AND STUDENT AGREEMENT/ACKNOWLEDGEMENT FORM ANABOLIC STEROID USE AND RANDOM STEROID TESTING FORM, UIL, https://www.uiltexas.org/files/health/steroid-agreement.pdf ("Steroid Policy Form").

§ 481.129(c)(1) (criminalizing the knowing delivery of "a prescription . . . for [something] other than a valid medical purpose in the course of professional practice"). Courts construing this language have therefore referenced professional standards of care to emphasize whether conduct is, in fact, undertaken with a valid medical purpose. *See, e.g.*, *Scally v. Tex. State Bd. of Med. Exam'rs*, 351 S.W.3d 434, 450–56 (Tex. App.—Austin 2011, pet. denied) (affirming Medical Board's license revocation given substantiated standard-of-care violations, which demonstrated the lack of a "valid medical purpose"); *see also, e.g.*, *United States v. Rosen*, 582 F.2d 1032, 1036 (5th Cir. 1978) (noting the absence of a legitimate medical purpose under a federal analog where the physician conducted no physical examination, issued many prescriptions, and used "street slang" in reference to drugs); *United States v. Collier*, 478 F.2d 268, 270–72 (5th Cir. 1973) (rejecting vagueness challenge to a federal analog, where the phrase "course of professional practice" was "[m]anifestly . . . intended to limit . . . immunity" and did not aid "doctors [who] become drug 'pushers'").

To be sure, the existence of a "valid medical purpose" would in certain cases represent a fact question based on applicable standards of care. But the Legislature answered the question here as a matter of public policy when it recently enacted a new subchapter within the Health and Safety Code to address "Gender Transitioning and Gender Reassignment Procedures and Treatments for Certain Children."[4] Act of May 17, 2023, 88th Leg., R.S., ch. 335, § 2, 2023 Tex. Gen. Laws 732, 732–33 (codified at TEX. HEALTH & SAFETY CODE §§ 161.701–.706); *see generally State v. Loe*, 692 S.W.3d 215, 239 (Tex. 2024) (upholding constitutionality). Accordingly, in Texas it is *unlawful* to "provide, prescribe, administer, or dispense . . . prescription drugs that induce transient or permanent infertility," which includes "supraphysiologic doses of testosterone to females" for "transitioning a child's biological sex." TEX. HEALTH & SAFETY CODE § 161.702(3)(B); *see also, e.g.*, *id.* § 161.706(a) (permitting "the attorney general [to] bring an action . . . to restrain or enjoin [a] person from committing, continuing to commit, or repeating the violation"). Further, the Legislature simultaneously amended the Occupations Code to make a violation of this section a "prohibited practice" that requires revocation of a physician's "license or other authorization to practice medicine." Act of May 17, 2023, 88th Leg., R.S., ch. 335, § 4, 2023 Tex. Gen. Laws 732, 734 (codified at TEX. OCC. CODE § 164.0552(a)).

Ultimately, the illegal provision of steroids to a child—conduct that would independently justify liability and revocation of one's medical license—cannot constitute a "valid medical purpose" undertaken "in the course of professional practice." TEX. EDUC. CODE § 33.091(h); *see also* Tex. Att'y Gen. Op. No. KP-0401 (2022) at 1, 13 (concluding sex-change treatments, including "supraphysiologic doses of testosterone to females," can constitute child abuse under the

---

[4] The Legislature's conclusion, of course, simply confirms reality: Myriad entities and institutions around the world have conducted systematic reviews of the "science" behind cross-sex hormones for children with gender dysphoria and universally concluded that the putative evidence behind this abusive practice is non-existent. *See, e.g.*, Hilary Cass, M.D., *Independent Review of Gender Identity Services for Children and Young Adults*, NATIONAL HEALTH SERVICES ENGLAND (Apr. 2024), https://cass.independent-review.uk/home/publications/final-report/; Jonas. F. Ludvigsson, et al., *A Systematic Review of Hormone Treatment for Children with Gender Dysphoria and Recommendations for Research*, 112 ACTA PAEDIATRICA 2279, 2280 (2023); Romina Brignardello-Petersen & Wojtek Wiercioch, *Effects of Gender Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence* (May 16, 2022), https://ahca.myflorida.com/content/download/4864/file/AHCA_GAPMS_June_2022_Attachment_C.pdf.

Family Code). To be sure, there is a narrow exception to the general prohibition; but it does not contemplate continued attempts to transition a child. TEX. HEALTH & SAFETY CODE § 161.703. The statute excepts "a continuing course of treatment that the child began before June 1, 2023" so long as the child also "attended 12 or more sessions of mental health counseling or psychotherapy during a period of at least six months before the date the course of treatment began." *Id.* § 161.703(b). Importantly, however, the statute also directs that individuals within this narrow group "shall wean off the prescription drug over a period of time and . . . may not switch to or begin a course of treatment on another prescription drug" that is prohibited under section 161.702. *Id.* § 161.703(c). As a result, there can be no valid medical purpose where a child's use of steroids extends farther—let alone at present, a year-and-a-half after Texas law mandated children "wean off" any such treatments. *Id.* § 161.702–.703. This impossibility is only magnified by the fact that the "wean off" period itself cannot convert what was (and still is) child abuse into the valid, professional provision of medical care. *See* Tex. Att'y Gen. Op. No. KP-0401 (2022) at 1, 13.

> **UIL has the authority and obligation to enforce its rules, and UIL may remove a student-athlete from participating in UIL activities if their eligibility is "questioned."**

Your remaining questions pertain to UIL's authority to investigate illegal steroid use by a student-athlete. Attachment at 2. Though you acknowledge the statutory mandate that UIL adopt rules requiring "random testing," TEX. EDUC. CODE § 33.091(d), you indicate that the Legislature no longer funds the program. Attachment at 2. You therefore ask whether UIL may alternatively query a student-athlete or their parents about the illegal provision of steroids. *Id.*

The answer is yes. As you share, UIL has already "received numerous inquiries from coaches and parents of UIL participants expressing concerns about a female student-athlete who may be taking testosterone."[5] *Id.* at 2–4. Those concerns validly implicate the student-athlete's eligibility to participate in an athletic competition and implicate the District Executive Committee's obligation to "enforce all rules" as well as "investigate all allegations of violations of the UIL *Constitution and Contest Rules* regarding . . . students," which includes "the eligibility of contestants." CONSTITUTION AND RULES § 28(j)(1)–(2); *see also, e.g.*, TEX. EDUC. CODE §§ 33.091(b)(1) (granting UIL authority to sanction or prohibit participation in competition if a student uses steroids), .081(b) (providing that students enrolled in Texas school districts are subject to UIL rules regarding participation in extracurricular activities when under supervision of a school or district); *see generally Univ. Interscholastic League*, 319 S.W.3d at 959 (confirming the Education Code grants UIL rulemaking and sanctions authority on certain educational policies).

UIL's Constitution and Rules provide "standards of eligibility" with which student-athletes must comply "to earn the privilege of representing their schools in interschool contests."[6] Not only is acknowledgment of these rules a prerequisite for participation, TEX. EDUC. CODE § 33.203(a); CONSTITUTION AND RULES § 1205(a)(4), but a student-athlete and their parent or guardian must

---

[5] The use of testosterone by female athletes is nothing new. Prior to the fall of the Berlin Wall, the East German government's notorious use of performance-enhancing drugs propelled their women's swimming team to capture eleven gold medals at the Montreal Olympics—placing the former country second overall with a total of forty gold medals. Guy Jackson, *Doping for Glory in East Germany*, THE UNESCO COURIER 10–11 (Sept. 2006).

[6] *About the UIL*, UIL, https://www.uiltexas.org/about (last visited Feb. 5, 2025).

also sign the Steroid Policy Form attesting to compliance with the steroid policy *before* taking part in any covered activities. *See* TEX. GOV'T CODE § 33.091(b); CONSTITUTION AND RULES § 1205(a)(5). Even more, taking steroids for an invalid medical purpose or falsifying the requisite forms violates the UIL's eligibility requirements and can result in sanctions against the student-athlete—including a bar on participation. *See* CONSTITUTION AND RULES § 50(a)(1) (violating eligibility rules), (a)(2) ("falsifying records or reports or withholding information"), (a)(4) ("failing to comply with applicable state laws regarding extracurricular activities"). "School district personnel," too, may prove liable for "failing to report known violations in a timely manner or withholding information." *Id.* § 51(a)(6).

At bottom, the student-athlete's eligibility has already been questioned by multiple sources. *Id.* UIL therefore has the obligation to investigate and the coordinate authority to remove the student-athlete from covered activities until they can prove eligibility by a preponderance of the evidence. CONSTITUTION AND RULES §§ 28(j)(1)–(2) (enforcement and investigation mandate), 410(a) (providing that student's eligibility need only be "questioned" to trigger an eligibility inquiry); *see also, e.g.*, 2024–2025 DISTRICT EXEC. COMMITTEE ATHLETIC HANDBOOK, UIL, 13, https://www.uiltexas.org/files/policy/2024-2025_DEC_HB.pdf (noting that if a student cannot attend an eligibility hearing, "a student may not participate in varsity competition until . . . a decision [is] reached"). A failure to meet that burden, for whatever reason, would mean that the student-athlete *remains* ineligible and should be removed from UIL contests.

> **A student-athlete whose eligibility is "questioned" must demonstrate their eligibility by a preponderance of the evidence in order to participate in covered events.**

"If a student's eligibility to compete in a UIL contest is questioned," the rules provide, "the student has the *burden* in any proceeding to establish by the *preponderance of the evidence* that he or she is eligible." CONSTITUTION AND RULES § 410(a) (emphasis added). Though "burden" and "preponderance of the evidence" are not defined in the UIL's rules or in the Education Code, "the common, ordinary meaning" should control. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018). A "burden" is a "duty or responsibility," BLACK'S LAW DICTIONARY 208 (8th ed. 2004); *see also id.* at 209 (defining "burden of persuasion" as "[a] party's duty to convince the fact-finder to view the facts in a way that favors that party"), and a "[p]reponderance of the evidence" means "[t]he greater weight of the evidence" that "incline[s] a fair and impartial mind to one side of the issue rather than the other," *id.* at 1220. As such, the student-athlete must present "credible evidence that would create a reasonable belief in the truth of [their eligibility]." *Herrera v. Stahl*, 441 S.W.3d 739, 741 (Tex. App.—San Antonio 2014, no pet.) (discussing the meaning of "preponderance of the evidence").

We emphasize once more that the burden of proof is on the student-athlete to demonstrate eligibility once "questioned." CONSTITUTION AND RULES § 410(a). Whether the student-athlete fails or simply refuses that obligation does not change that UIL should, in either circumstance, conclude the student-athlete *remains* ineligible for participation. A refusal to cooperate with the valid, investigatory prerogative of UIL amounts to little more than a conscious choice to decline the burden that rests squarely with the student-athlete.

**S U M M A R Y**

A "valid medical purpose" under Education Code section 33.091 does not contemplate the provision of steroids to a minor for transitioning the minor's biological sex. Suspected use of steroids for this purpose is a basis to question the student-athlete's eligibility to participate in University Interscholastic League (UIL) activities and obligates UIL to investigate as well as require the student-athlete prove by a preponderance of the evidence that they are eligible. A student-athlete may not take part in UIL competitions until their eligibility is proven by a preponderance of the evidence.

Very truly yours,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

JOSHUA C. FIVESON
Chair, Opinion Committee

AMY L. K. WILLS
Assistant Attorney General, Opinion Committee